UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MARK BRAULT,  :
    :
    Plaintiff,  :
    :
v.  : CASE NO. 3:05-CV-1409 (RNC)
    :
MANUEL ACOSTA, RAYMOND BUTHE,  :
AND JAMES KEENEY,  :
    :
    Defendants.  :

## RULING AND ORDER

Plaintiff Mark Brault brings this action under 42 U.S.C. § 1983 seeking damages for false arrest and malicious prosecution following his acquittal on charges of criminal mischief and reckless burning. Plaintiff claims that defendant Manuel Acosta, a Connecticut State Trooper, caused him to be arrested without probable cause after ignoring evidence of his innocence and failing to investigate his alibi. Plaintiff further claims that, although Acosta eventually interviewed four alibi witnesses after the arrest, he failed to accurately report the information obtained from the interviews to prosecutors. The matter is before the Court on a motion for summary judgment [Doc. 24]. For the reasons that follow, the motion is granted.[1]

---

[1] The complaint alleges claims against two other defendants, Connecticut State Troopers Raymond Buthe and James Keeney, but plaintiff has stipulated that the claims against them may be dismissed with prejudice (Mem. Opp. Summ. J. at 2).

I.   Facts

On September 20, 2004, Trooper Acosta was dispatched to investigate a complaint of criminal mischief reported by James Campbell. Acosta arrived at Campbell's home at 11:30 a.m. and proceeded to interview him. Campbell stated that about an hour earlier, he heard a knock at his door but chose not to answer it. A few minutes later, he looked outside and saw smoke and a pickup truck near a boat trailer owned by his roommate, Ken Gaudet. He went outside to investigate, saw a man he knew as "Mark" using portable propane torches while bent over the trailer, and saw sparks and fire coming off the trailer. Campbell stated that when he approached, Mark reacted nervously and threw the propane torches into the back of the pickup truck while the torches were still burning. Campbell asked Mark what he was doing. According to Campbell, Mark replied that he was working on Ken's boat trailer, then got into the pickup truck and drove away.

Campbell's roommate, Michael Peck, was also interviewed. He stated that he had witnessed Campbell's confrontation with Mark. Both Campbell and Peck claimed to recognize Mark from Accra-Temp, Inc., where Peck and Gaudet were then employed. Peck told Acosta that Mark had been laid off from Accra-Temp a few days earlier. Peck stated that Gaudet was rumored to have some responsibility for Mark's being laid off. Peck identified Mark's pickup truck as a two-tone black and grey Ford F150 with a six foot bed and a black

2

cap, and stated that he had seen Mark drive the truck to work.

Trooper Acosta inspected the boat trailer. A padlock on the trailer was cut and burned. Both sides of the trailer frame also were cut, almost severing the frame in half. Acosta then spoke with Gaudet by phone. Gaudet said that he had not given plaintiff permission to work on the trailer and wanted to press charges. Acosta also telephoned the office manager at Accra-Temp, who confirmed that plaintiff had been laid off and gave Acosta plaintiff's home address and phone number.

Acosta called plaintiff's cellular and home telephones and heard answering machine messages inviting callers to leave messages for Mark or BT Mechanical Services. Acosta queried the motor vehicle database and found a 2001 Ford Model F150 grey pick-up truck registered to BT Mechanical Services in Berlin, Connecticut.

Having obtained all this information, Acosta arranged for Trooper Raymond Buthe to visit plaintiff's home. Buthe arrived there at approximately 12:30 p.m. and saw a two-tone black and grey 2001 Ford F150 pickup truck with a black cap parked in the driveway. Buthe spoke with the plaintiff, who denied vandalizing Gaudet's boat trailer. Buthe inspected the bed of the pickup and found no propane torches or burn marks. Several propane torches were inside plaintiff's home but they did not appear to Buthe to have been used recently. Plaintiff also told Buthe that he had just come from the home of a friend, Peter Zurles.

Buthe contacted Acosta by telephone and reported his observations and plaintiff's statements. Acosta instructed Buthe to arrest the plaintiff and Buthe did so. Buthe told the plaintiff he was sorry to have to arrest him but had no choice. Plaintiff was charged with criminal mischief in the second degree and reckless burning.[2] He was released on bond the same day.

Several months later, Trooper Acosta interviewed four alibi witnesses at the request of the prosecutor's office. Plaintiff's criminal defense lawyer supplied Acosta with the names and contact information of the witnesses. Three of the witnesses stated that they had seen plaintiff at their workplace at the Windsor Marketing Group at approximately 10:30 a.m. on the day Gaudet's trailer was vandalized. Each of the three witnesses gave Acosta a written statement, which he appended to his report and forwarded to the

---

[2] Connecticut's Reckless Burning and Criminal Mischief statutes provide:
> A person is guilty of reckless burning when he intentionally starts a fire or causes an explosion, whether on his own property or another's, and thereby recklessly places a building . . . of another in danger of destruction or damage;
> . . . .
> A person is guilty of criminal mischief in the second degree when: (1) With intent to cause damage to tangible property of another and having no reasonable ground to believe that such person has a right to do so, such person damages tangible property of another in an amount exceeding two hundred fifty dollars.

Conn. Gen. Stat. §§ 53a-114(a), 53a-116(a).

The term "building" includes "any . . . trailer." Conn. Gen. Stat. § 53a-100(a)(1).

4

prosecutor's office. Zurles, the fourth witness, did not provide a written statement but told Acosta that he was with plaintiff at approximately 12:00 p.m. on the day of the incident and observed plaintiff receiving a call from Acosta on a cellular telephone. Acosta wrote in his report to the prosecutor that the reported time of the offense was only an approximation; that plaintiff had provided no alibi witnesses prior to 10:20 a.m. on the day of the offense; that the distance between Windsor Marketing Group and the crime scene was thirty-one miles; and that this distance could be driven in under thirty minutes.

II. <u>Summary Judgment</u>

Summary judgment may be granted only when there "is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

In assessing the evidence, the Court must review the record as a whole, credit all evidence favoring the nonmovant, give the nonmovant the benefit of all reasonable inferences, and disregard all evidence favorable to the movant that a jury would not have to believe. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150-51 (2000).

5

III. Discussion

   The False Arrest Claim

   The Fourth Amendment protects against arrests made without probable cause. Caldarola v. Calabrese, 298 F.3d 156, 161 (2d Cir. 2002). In deciding whether probable cause existed for an arrest, it is necessary to consider the "totality of the circumstances." Illinois v. Gates, 462 U.S. 213, 233 (1983). This requires consideration of "'the facts available to the officer at the time of the arrest and immediately before it.'" Caldarola, 298 F.3d at 162 (quoting Lowth v. Town of Cheektowaga, 82 F.3d 563, 569 (2d Cir. 1996)). Probable cause to arrest "exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996). When an arrest is based on the report of an identified bystander or victim, probable cause is ordinarily deemed to exist unless there is reason to doubt the witness's veracity. Caldarola, 298 F.3d 163 (collecting cases); Curley v. Village of Suffern, 268 F.3d 65, 70 (2d Cir. 2001).

   Applying these rules, Trooper Acosta had probable cause to believe that plaintiff was guilty of criminal mischief and reckless burning. At the time of arrest, Acosta had statements from two eyewitnesses, Campbell and Peck, who said they recognized the

plaintiff as the perpetrator and gave reasonably accurate descriptions of his pickup truck. In addition, Acosta had been informed by Peck that plaintiff may have been motivated to commit the offense in revenge for Gaudet's rumored involvement in plaintiff's being laid off from Accra-Temp. Acosta also knew from Trooper Buthe that plaintiff had access to, and apparently knew how to use, propane torches.

Plaintiff emphasizes that Campbell and Peck gave somewhat inconsistent and inaccurate descriptions of plaintiff's pickup truck, and that Trooper Buthe did not observe any burn marks in the bed of plaintiff's pickup. These matters did not negate probable cause. Plaintiff also emphasizes that Trooper Acosta failed to interview his friend Zurles before ordering the arrest. Acosta had no affirmative duty to investigate plaintiff's innocence. See Curley, 268 F.3d at 70 ("[T]he arresting officer does not have to prove plaintiff's version wrong before arresting him. . . . Nor does it matter that an investigation might have cast doubt upon the basis for the arrest."); Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997) ("Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest."). Moreover, neither plaintiff's statement at the time of the arrest nor Zurles's statement to Acosta after the arrest suggests that Zurles could

7

have vouched for plaintiff's whereabouts at any time before 12:00 p.m. on the day in question.

### The Malicious Prosecution Claim

Plaintiff contends that once Acosta interviewed his alibi witnesses, he had a duty to take affirmative steps to terminate the prosecution. The Second Circuit recently recognized the existence of such a duty in Russo v. City of Bridgeport, 479 F.3d 196 (2d Cir. 2007). However, the facts of Russo are clearly distinguishable. The plaintiff in Russo was incarcerated on suspicion of armed robbery for 217 days despite the availability of a surveillance videotape showing that he was not the robber. The investigating officers had seen the tape and had reason to know it was exculpatory, yet failed to reveal this to either the prosecutors or the plaintiff. Id. at 206.

In this case, Acosta did not withhold exculpatory information. The alibi witnesses' written statements were appended to his report and provided to the prosecutor, who was thus able to make her own independent assessment of their significance. In light of this fact a reasonable jury would have to reject plaintiff's claim.

### IV. Conclusion

For the foregoing reasons, defendants' motion for summary judgment (doc. #24) is hereby granted. Judgment may enter in favor of defendants, dismissing the complaint with prejudice.

So ordered this 25th day of July 2007.

                                               /s/
                                      Robert N. Chatigny
                             United States District Judge